OPINION OF THE COURT
 

 R.S. Smith, J.
 

 The issue in this case is whether a continuing guaranty
 
 *497
 
 containing an expiration date requires the guarantor to pay obligations that were contractually binding, but were not yet due and payable, at the time the guaranty expired. We hold that the guaranty does require payment of such obligations, where it does not express a contrary intention.
 

 Facts
 

 The essential facts can be very briefly summarized. Metallgesellschaft Capital Corp. (MG Capital) issued a continuing guaranty on July 28, 1993, guaranteeing payment by its indirect subsidiary, MG Refining and Marketing, Inc. (MGRM), under contracts that MGRM had entered or would enter with Louis Dreyfus Energy Corp. (LDEC). On September 27, 1993, MGRM and LDEC entered into two contracts that were within the scope of the guaranty, in which MGRM became contractually bound to obligations that were conditional on futures prices for petroleum products reaching a particular level. On September 30, 1994, MG Capital’s guaranty expired. In 1996, the futures prices reached the specified level, and MGRM’s contractual obligations were triggered. The question presented is whether MG Capital is liable for those obligations.
 

 To help in understanding the question, we will state the facts in more detail. LDEC, an energy trading firm, and MGRM, a marketer of petroleum products, had a business relationship going back to at least 1989. During much if not all of the relationship, each party’s obligations to the other were backed by a guaranty from the party’s corporate parent or affiliate. As of September 1993, LDEC’s parent, Louis Dreyfus Corporation (LDC), was guaranteeing LDEC’s obligations to MGRM under a guaranty dated May 18, 1992 (the LDC Guaranty), while MG Capital was guaranteeing MGRM’s obligations to LDEC under a guaranty dated July 28, 1993 (the MG Capital Guaranty). The MG Capital Guaranty is the one at issue on this appeal.
 

 The LDC Guaranty and the MG Capital Guaranty were largely identical in wording. Each guarantor stated that it “absolutely and unconditionally guarantees . . . the prompt, faithful and full payment of all sums that now are or may hereafter become due and payable . . . under the Contracts.” Each guaranty defined “Contracts” as “contracts for the sale, purchase or exchange of crude oil, oil products, natural gas, or natural gas products.” Each guaranty provided that it could be revoked in writing, and each set forth the specific consequences of such a revocation. Each provided that the revocation must
 
 *498
 
 specify an “Effective Date” and that the revocation “shall . . . apply only to” contracts entered into “on or after the Effective Date” and “shall not affect the liability of [the guarantor] in respect of any of the Contracts that were entered into before the Effective Date.”
 

 One difference between the two guaranties is at the center of this appeal. The LDC Guaranty did not contain an expiration date, but the MG Capital Guaranty did—and the consequences of expiration, unlike the consequences of revocation, were not explicitly stated. Thus, the MG Capital Guaranty provided:
 

 “This Guaranty is intended to be and shall be a continuing guarantee of payment and not of collection, and shall remain in full force and effect until the earlier of September 30, 1994 and the date on which it is revoked in writing by MGCC, which revocation shall (a) not be effective until the written notice setting out an effective date of revocation (the ‘Effective Date’) has been received by the Contractor and (b) apply only to those of the Contracts that were entered into by the Contractor on or after the Effective Date, and (c) shall not affect the liability of MGCC in respect of any of the Contracts that were entered into before the Effective Date.”
 

 The seven words underscored above—“the earlier of September 30, 1994 and”—had no counterpart in the corresponding paragraph in the LDC Guaranty.
 

 Most of the “Contracts” to which the guaranties applied were short term (30-to-90-day) agreements involving between 25,000 and 100,000 barrels of petroleum products. In 1993, however, LDEC and MGRM entered into three much larger and longer-term contracts—10-year arrangements, each involving a million barrels or more. The first of these three contracts was made in June 1993 and is not in dispute in this case. The remaining two, which are in dispute, were entered into on September 27, 1993.
 
 [1]
 

 The two September 27 contracts provided that LDEC would purchase from MGRM 42 million gallons (one million barrels) of
 
 *499
 
 gasoline and 42 million gallons of fuel oil no later than September 30, 2003. The price of each product was set at 62 cents per gallon. Delivery was to be in the amounts and at the times of LDEC’s choosing. Each contract gave LDEC an option, in the event the market moved in LDEC’s favor, to take its profit in cash. Thus at any time when the price of petroleum futures on the New York Mercantile Exchange exceeded the price fixed in the contract, LDEC could elect to receive from MGRM a cash payment reflecting the difference between the market price and the contract price.
 

 In January 1994, MGRM repudiated its obligations under the September 1993 contracts. LDEC did not sue immediately, but began this action in 1995 against MGRM, seeking a declaration that the contracts were “valid and existing.” LDEC was presumably hoping that sometime during the 10-year term of the contracts the market price would go up and generate a large claim in LDEC’s favor. This happened in 1996. On April 12, 1996, LDEC exercised its option under the gasoline contract, and on December 16, 1996 it exercised its option under the fuel oil contract. MGRM rejected LDEC’s first demand for payment and ignored the second.
 

 On April 9, 1998, LDEC demanded that MG Capital make payment of MGRM’s obligations under the two contracts. MG Capital
 
 [2]
 
 rejected the demand on the ground that it was “unaware of any liability of MGRM to LDEC.” MG Capital did not then assert that it was free from liability because its guaranty had expired.
 

 LDEC amended its complaint to add MG Capital as a defendant and to sue under the MG Capital Guaranty.
 
 [3]
 
 MG Capital moved for summary judgment, and Supreme Court granted its motion on the ground that the MG Capital Guaranty had expired before LDEC suffered any damages. The Appellate Division affirmed on the same ground. We granted leave to appeal, and now reverse.
 

 
 *500
 
 Discussion
 

 A guaranty is a contract, and in interpreting it we look first to the words the parties used (see
 
 Chemical Bank v Sepler,
 
 60 NY2d 289, 293 [1983]). But on the question here—whether the parties intended the MG Capital Guaranty to cover obligations that became binding before, but due and payable after, its expiration date—the document is silent. The consequences of
 
 revocation,
 
 as distinct from expiration, are spelled out: revocation “shall not affect the liability of MGCC in respect of any of the Contracts that were entered into before the Effective Date [of the revocation].” Thus if the MG Capital Guaranty had contained no expiration date, but had been revoked effective September 30, 1994, there would be no issue. MG Capital would unquestionably be liable under the September 27, 1993 contracts, even for obligations that were not triggered until 1996.
 

 MG Capital contends that, since the parties did not provide that expiration would have the same consequences as revocation, they must have intended different consequences. It is true that a careful drafter who intended the effect of expiration and revocation to be identical would have said so in the document. A minor revision of the relevant paragraph (quoted above at 498) would have been sufficient. But it is also true that a careful drafter who intended expiration to have different consequences would have spelled out those consequences in the document. This, too, would not have been difficult. The conclusion is inescapable that the drafter was not careful in this respect, and as a result the document does not make the parties’ intention clear on its face.
 

 It is possible, however, to discern the parties’ intention from the circumstances in which the MG Capital Guaranty was issued. LDEC and MGRM had a multiyear relationship, and there is no indication that they ever dealt with each other in the absence of parent guaranties. The LDC and MG Capital Guaranties, issued in 1992 and 1993 respectively, were preceded by similar documents. The only logical inference supported by this record is that neither LDEC nor MGRM wanted to take the risk of relying on the other’s unsupported credit.
 

 This risk could be eliminated only if the termination of a guaranty—whether by expiration or revocation—left the parent-guarantor liable for obligations (due or to become due in the future) to which its subsidiary was already bound. As long as
 
 *501
 
 the guarantor remained liable on preexisting contracts, the opposite party could, if it chose, protect itself against future risks by refusing to enter into any new contracts until a new guaranty was provided. But if the termination of the guaranty protected the guarantor against obligations not yet due under existing contracts, the opposite party would be left with exactly the problem the guaranty was designed to avoid—a debt from the subsidiary, unsupported by the parent-guarantor’s credit.
 

 In the case of revocation, the parties used express language to assure that this did not occur. They limited the effect of revocation to contracts entered into on or after the revocation’s “Effective Date,” and provided that liability under contracts entered into before the Effective Date would be unchanged. We conclude that the parties must have intended expiration to be limited in the same way, for an expiration that is not limited to future contracts can create the same risk as a revocation that is not so limited.
 

 It is true that, since the parties knew the expiration date in advance, LDEC could—if it believed the expiration of the guaranty would affect existing contracts—have insisted on an extension of the expiration date, or a new guaranty, before entering into any contracts that extended beyond the MG Capital Guaranty’s expiration. LDEC’s behavior shows, however, that it did not believe the expiration would affect existing contracts.
 

 On June 23, 1993, LDEC and MGRM entered into a 10-year agreement under which LDEC was to purchase from MGRM 50,400,000 gallons of fuel oil over a 10-year period beginning September 1, 1993. At the time the agreement was signed, the MG Capital Guaranty involved in this case had not yet been issued. The guaranty that was in force was a predecessor document, issued by a different corporation but identical in relevant respects, with an expiration date of September 30, 1993—29 days after the inception of the 10-year contract. Thus, if the expiration date eliminated the guarantor’s obligations on existing contracts, LDEC would be unprotected for 9 years and 11 months; there is no evidence that LDEC was willing to accept, or thought that it was accepting, such a risk. Nor is there any indication that, when it entered into the September 27, 1993 contracts now in suit, LDEC thought it would be unprotected by the MG Capital Guaranty for the last 9 years of these 10-year agreements. If LDEC had thought that, it would logically be expected at least to ask for an extension of the expiration
 
 *502
 
 date before it committed itself. There is no indication that it did so.
 

 Thus the purpose of the MG Capital Guaranty, and the parties’ course of dealing, show that expiration was understood to have the same effect as revocation—i.e., to have no effect on contracts entered into prior to the expiration date. That conclusion is reinforced by comparing the MG Capital Guaranty to the LDC Guaranty. The relevant paragraph of the MG Capital Guaranty is a virtual duplicate of the corresponding paragraph in the LDC Guaranty, except for seven words appearing only in the MG Capital Guaranty—“the earlier of September 30, 1994 and.” It is plain that the parties intended their guaranties to be largely identical, but that at some point, in some prior version of the MG Capital Guaranty, language 'creating an expiration date was added. It is improbable that the parties understood this difference between the two guaranties to be of vast significance—to leave LDEC at risk, while MGRM remained protected, on contracts extending beyond the expiration date. We conclude that the parties assumed expiration would have the same effect as revocation, and that the expiration date was no more than a kind of “Effective Date” of the revocation fixed in advance. On this reading, putting the expiration date into the guaranty was no more than a convenience; if it had not been there, MG Capital could have accomplished the same result by sending a notice of revocation with a September 30, 1994 Effective Date.
 

 A close reading of the relevant paragraph also suggests that the parties thought expiration and revocation were interchangeable. The MG Capital Guaranty was to remain in effect “until the earlier of’ the expiration date and the Effective Date of the revocation. This wording implies that there would be only one event—expiration or revocation, whichever came earlier—that could bring MG Capital’s obligation to an end. On this understanding, it would not make sense if expiration and revocation had substantially different consequences. MG Capital would harm its own interest by revoking the guaranty, and leaving itself hable on existing contracts, if it could escape such liability by waiting for the expiration date.
 
 [4]
 

 
 *503
 
 There are not many authorities that consider the impact of terminating a guaranty on obligations that may arise in the future under preexisting contracts. The authorities that do exist, however, support the view that the guarantor should be held liable for such obligations, unless the guaranty expressly shields it from liability. It will normally be true, as we think it is in this case, that the purpose of a continuing guaranty is to enable parties who enter into contracts to be secure in the knowledge that whatever debts become due them under the contracts will be protected by the guaranty. This purpose is best served by a general rule as we have stated it. A similar rule is stated in section 16 of Restatement (Third) of Suretyship and Guaranty:
 

 “Upon termination of a continuing guaranty, the continuing guarantor remains a secondary obligor with respect to obligations of the principal obligor incurred prior to termination and becomes a secondary obligor with respect to obligations of the principal obligor incurred by extensions of credit to the principal obligor after termination pursuant to a commitment that became binding before termination.”
 

 The first half of the above sentence is arguably ambiguous, because it is not clear what “incurred” means in this context: Is an obligation “incurred” when it is contracted for, or when it becomes due and payable? However, the second half of the sentence (after the “and”) has no such ambiguity. It says that if a creditor extends credit “after termination” of a guaranty, “pursuant to a commitment that became binding before termination,” the guarantor is liable to make good (“becomes a secondary obligor with respect to”) the resulting obligations. While this portion of the Restatement is most obviously applicable to a revolving credit agreement or other loan agreement, in which a lender commits to lend money before termination and honors the commitment afterwards, it can apply to a fact pattern like the present one also. Here there were commitments that became binding before termination—the contracts of September 27, 1993—and when MGRM’s obligations to make payments under those contracts became due in 1996, LDEC became MGRM’s creditor as a result of its pretermination commitments. Whether or not LDEC literally “extended credit” to
 
 *504
 
 MGRM, there is no apparent reason why the principle underlying the Restatement section should not apply. Under the approach of the Restatement, MG Capital should be bound to pay MGRM’s obligations.
 

 While we have found no New York case directly in point, our decision in
 
 Corn Exch. Bank Trust Co. v Gifford
 
 (268 NY 153 [1935]) offers support for our conclusion here. That case involved a loan by the bank to a corporate borrower, secured by the guaranty of Gifford, the father-in-law of the corporation’s treasurer. The guaranty stated that it “shall remain in force until duly revoked . . . and shall extend to and cover all renewals of any claims or demands guaranteed ... or the extensions of time of payment thereof’
 
 (id.
 
 at 157). The loan was evidenced by a promissory note of the corporate borrower that was repeatedly renewed and extended. Gifford revoked his guaranty, and after his revocation the bank and the borrower again renewed and extended the note, though the indebtedness was not increased. The question before us was whether the posttermination renewals discharged Gifford from his obligation under his guaranty. We held that they did not, basing that conclusion on the guaranty’s language covering “all renewals.” We said:
 

 “These words are broad enough to cover the renewals of an indebtedness existing at the time of revocation. The words used are ‘all renewals.’ The parties could easily have said ‘or the extension of time of payment thereof prior to revocation’ if such a meaning were intended. The words ‘prior to revocation’ are not used.” (268 NY at 159.)
 

 Corn Exchange
 
 thus stands for the proposition that the words “prior to revocation” will not automatically be read into every commitment made by a guarantor; a guarantor who wishes to limit his obligations in this way should do so expressly. Here, MG Capital guaranteed payment of “all sums that now are or may hereafter become due and payable . . . under the Contracts.” If it meant “all sums that may become due and payable prior to the expiration date” it should have said so.
 

 So far as we are aware, the only case that addresses the issue we have here is
 
 Bandag, Inc. v National Acceptance Co. of Am.
 
 (855 F2d 491 [7th Cir 1988]). In that case, National Acceptance Company of America (NAC) had issued a guaranty to Bandag promising to “make payments to you of invoices for merchandise” shipped by Bandag to a purchaser known as McCord
 
 (id.
 
 
 *505
 
 at 492). The guaranty had an expiration date of December 31, 1985. Bandag’s invoices called for payment in 90 days from shipment; it shipped some goods in late 1985, so that although McCord’s obligation to pay existed before the guaranty expired, its payments were not due until early 1986, after the expiration date. The court, applying Illinois law, held that NAC must pay the invoices. The court relied on the specific language of the guaranty in question, but also on the business purpose served by the guaranty. The court said:
 

 “[T]he construction urged by NAC would invalidate the guaranty as the termination date approached. Ordinarily, Bandag provided goods to McCord on ninety days’ credit. NAC and Bandag entered into the guaranty because Bandag would not continue to do this without security. . . . Therefore, the obvious purpose of the letter of guaranty was to allow Ban-dag to continue to sell goods to McCord without suffering insecurity (due to lack of legal recourse). . . . However, under the construction urged by NAC, Bandag’s sales to NAC would be guaranteed during the final ninety days of the guaranty period only if Bandag changed the terms of its invoices so that they would become due before the termination date. Otherwise, all of Bandag’s sales to McCord in the last ninety days of the guaranty period would be unsecured by the guaranty.”
 
 (Id.
 
 at 495.)
 

 A similar analysis applies here. The “obvious purpose” of the MG Capital Guaranty was to allow LDEC to continue to deal with MGRM “without suffering insecurity (due to lack of legal recourse).” But under MG Capital’s reading of the guaranty, LDEC would become insecure to the extent that MGRM’s contractual commitments extended beyond the expiration date. Since certain of those commitments extended nine years beyond the expiration date, the guaranty, if read as MG Capital urges, would fail to serve its purpose.
 

 In short, we conclude that the MG Capital Guaranty must be read as requiring MG Capital to pay obligations of MGRM under contracts that were entered into before the expiration date of the guaranty, even where the obligations became due and payable after the guaranty expired.
 

 Accordingly, the order of the Appellate Division should be reversed, with costs, and MG Capital’s motion for summary judgment denied.
 

 
 *506
 
 Chief Judge Kaye and Judges G.B. Smith, Ciparick, Rosenblatt, Graefeo and Read concur.
 

 Order reversed, etc.
 

 [1]
 

 . In identifying and describing the September 27 “contracts,” we state the version of the facts most favorable to LDEC, the party against which summary judgment was granted below. MG Capital and MGRM contend, among other things, that the September 27 communications between LDEC and MGRM did not constitute contracts, but offers that were subsequently revoked; and that, if they were contracts, they were illegal and unenforceable.
 
 *499
 
 We express no view on these issues, or on any issue other than the effect of the expiration date on the MG Capital Guaranty.
 

 [2]
 

 . MG Capital apparently changed its name at some point to either MG North America Holdings Inc. (the name that appears on its 1998 rejection of LDEC’s demand) or MG Holdings North America, Inc. (the name used in recent court papers). For ease of reference, we use “MG Capital” throughout this opinion.
 

 [3]
 

 . LDEC later assigned its claims to its parent, LDC, which joined the action as a coplaintiff.
 

 [4]
 

 . At oral argument, MG Capital suggested that there could be both a revocation and an expiration, because a revocation would be ineffective as to obligations under existing contracts. As to those contracts, on MG Capital’s theory, the guaranty would remain in effect after revocation until, but only until, the expiration date. But this theory does not fit the contractual
 
 *503
 
 language; the language gives effect to the expiration date only if it is “earlier” than revocation, not if it is later but the revocation has left some obligations in force.