*Israel v. Chabra*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

————————————

August Term, 2006

(Argued: August 7, 2007            Certified Question: August 5, 2008
                                           Decided: April 1, 2010)

Docket Nos. 06-1467-cv(L), 06-1473-cv(CON)

————————————

MICHAEL ISRAEL AND STEVEN ISRAEL,

*Plaintiffs-Appellees*,

-*v.*-

SURINDER S. CHABRA,

*Defendant-Appellant*,

PARAN REALTY CORP.,

*Defendant*.

————————————

BEFORE: CALABRESI, RAGGI, HALL, *Circuit Judges*.

————————————

1

Appeal from an order of the United States District Court for the Southern District of New York (Chin, J.), finding Defendant-Appellant Surinder Chabra liable for a debt owed Plaintiffs pursuant to a guaranty of that debt. VACATED AND REMANDED.

_____

SUSAN R. NUDELMAN, Dix Hills, New York, *for Plaintiffs-Appellees*.

HOWARD W. BURNS, JR., New York, New York, *for Defendant-Appellant*.

_____

PER CURIAM:

This is an appeal from an order of the United States District Court for the Southern District of New York (Chin, J.), finding Defendant Surinder "Sonny" Chabra liable to Plaintiffs Michael Israel and Steven Israel ("the Israels") for debts owed them by AMC Computer Corp. ("AMC") pursuant to Chabra's guaranty of those debts. We previously certified a controlling question of law to the New York Court of Appeals. Having received that Court's answer to the certified question, we now vacate the judgment of the district court and remand for further proceedings.

**BACKGROUND**

A detailed recitation of the relevant facts and procedural history can be found in our previous opinion in this case, and we assume the reader's familiarity with that opinion. *See Israel v. Chabra*, 537 F.3d 86, 88-92 (2d Cir. 2008) ("*Israel I*"). We set forth herein a condensed version of the facts in order to explain our disposition of the appeal following the answer to the certified question.

2

In brief: the Israels entered into separate employment agreements with AMC in May 2000, at the same time that AMC was in the process of merging with a third-party investor. *See Id.* at 89. In a Letter of Intent, which was signed by AMC, both of the Israels, Chabra (who signed both as an individual and as an officer of AMC), and the third-party investor, Chabra promised to pay each of the Israels a $2 million bonus if the third-party investor completed its planned investment in AMC. *Id.* In July 2000, the parties agreed to what they call the "First Amendment" to the agreements, which made the following changes to the agreements: (1) AMC assumed primary responsibility for paying the bonuses, but Chabra agreed to guaranty the payments; (2) the bonus amount was reduced to $1.75 million for each of the Israels; (3) the bonuses became due upon completion of a proposed merger between AMC and the third-party investor; and (4) the payments were to be made in twelve equal quarterly installments, the first of which would be due three months after the merger. *Id.*

Pursuant to the First Amendment's requirement that he guaranty the bonuses, Chabra signed an identical Guaranty for each of the Israels, reading in relevant part as follows:

> Surinder (Sonny) Chabra ("Guarantor") hereby absolutely, unconditionally and irrevocably guarantees to Israel (i) the full, due and punctual payment, whether at stated payment dates, by acceleration or otherwise, of any amounts owed under Section 3.4 of the Employment Agreement (including interest as described therein), and (ii) the prompt reimbursement of or payment for any and all ... expenses and liabilities (including reasonable attorneys' fees) incurred by Israel in enforcing any rights under this Guaranty (collectively, the "Obligations"), and further guarantee[s] that any such amounts shall be paid when due without presentation, demand, notice or protest of any kind with the same effect as though the Guarantor was AMC in and for the purposes of Section 3.4 of the Employment Agreement; *provided, however,* that Israel has given Guarantor written notice ("Notice") of AMC's failure to pay any Obligation within 60 days of the occurrence of each failure. Guarantor will then have 30 days to make such payments (or to cause AMC to make such payments).

> ... The liability of the Guarantor under this Guaranty shall be absolute and unconditional irrespective of ... any change in the time, manner or place of payment of, or in any other term of, all or any of such provisions or the Obligations....
>
> ... The Guarantor hereby waives promptness, diligence, dishonor, default, forbearance, notice of acceptance and any other notice with respect to any of the Obligations and this Guaranty, except the Notice.

... References to the Employment Agreement shall mean the Employment Agreement immediately after the execution of Amendment No. 1 and shall not be affected by subsequent amendments to the Employment Agreement unless Guarantor has agreed in writing to such amendments.

*Id.* at 89-90 (emphasis in original). The merger occurred on August 30, 2000, and the first bonus payments thus became due on November 30, 2000. *Id.* at 89.

AMC did not make all of the scheduled payments, and the Israels sent notices of default to AMC on February 26, 2003, March 5, 2003, and March 17, 2003, copying Chabra in his individual and corporate capacities. *Id.* at 90. In April 2003, the Israels and AMC signed a modified payment schedule, which the parties refer to as the "Second Amendment," and which: (1) restated the amount remaining due on the bonuses; (2) established a new payment schedule that was to start on April 20, 2003, and end with a final payment on December 5, 2003; and (3) expressed "the intention of the parties that the guaranty agreement by and among Employee and Surinder (Sonny) Chabra shall continue in full force and effect until the Employer has made all payments." *Id.* Chabra signed the Second Amendment only on lines indicating his role as an officer of AMC. *Id.* AMC made its last payment on February 15, 2004, and the Israels sent AMC and Chabra notices of default starting on March 31, 2004. *Id.*

An attempt at arbitration failed. *Id.* at 91. The Israels then brought this action to enforce the Guaranty, and the district court granted summary judgment in their favor, ruling that: (1) Chabra remained bound by the Guaranty despite the modifications to the payment schedule made

4

by the Second Amendment; (2) Chabra had consented to the Second Amendment in his individual capacity by signing it; (3) even if Chabra had not consented to the Second Amendment, the payment schedule did not discharge the Guaranty because the Guaranty stated that it was "unconditional irrespective of ... any change in the time, manner or place of payment"; (4) the provision of the Guaranty requiring written notice to Chabra within 60 days of AMC's failure to pay any obligation was not a condition precedent to Chabra's obligations under the Guaranty; and (5) AMC did not default until it failed to make payments after February 15, 2004 (under the schedule set forth in the Second Amendment). *Id.* at 91 (internal quotation marks omitted). The district court awarded each of the Israels $332,816.57 in damages and later awarded them $299,890.51 in attorneys' fees and costs, to be divided between them. *Id.* at 91.

Chabra appealed, and, in our opinion in *Israel I*, we were able to resolve two key questions presented by the appeal. *Id.* at 92-95. First, we held that the notice requirement in the Guaranty was a condition precedent to Chabra's obligations, that the district court had erred in holding otherwise, and that it was therefore necessary to consider whether that condition precedent had been satisfied. *Id.* at 92-94. Second, we held that because the Guaranty required notice for "each failure" by AMC to make a payment, the notice requirement was divisible and Chabra's obligations were "payment-specific," meaning that Chabra's obligations must be discharged with respect to any missed payment for which the Israels failed to provide timely notice but that his obligations would remain in place with respect to any missed payments for which the Israels had provided timely notice. *Id.* at 94-95.

We were not, however, able to resolve a third question at that time: Is Chabra's liability governed by the First Amendment payment schedule (as contended by Chabra) or by the Second

Amendment payment schedule (as contended by the Israels)?  *Id.* at 96-100.  Each party pointed to a clause in the Guaranty that supported his preferred result.  *Id.* at 96.  The Israels relied upon what we have come to refer to as the "Consent Clause," the part of the Guaranty stating that Chabra's obligations under the Guaranty are "absolute and unconditional irrespective of ... any change in the time, manner or place of payment of, or in any other term of, all or any of such provisions or the Obligations."  *Id.*  Chabra relied upon what we have called the "Writing Requirement," which stated that "[r]eferences to the Employment Agreement shall mean the Employment Agreement immediately after the execution of [the First Amendment] and shall not be affected by subsequent amendments to the Employment Agreement unless Guarantor has agreed in writing to such amendments."  *Id.*  Chabra argued that the Second Amendment was a "material alteration of the terms" of the Guaranty and that the Writing Requirement prohibited it from being effective without his written consent.  *Id.*  The Israels argued that the Second Amendment, which merely modified the payment schedule, was within the scope of the Consent Clause because it effected only a "change in the time, manner or place of payment."  *Id.*

We rejected the district court's conclusion that Chabra had agreed to the Second Amendment in writing.  We held that he had signed it only in his capacity as an officer of AMC and not as an individual.  *Id.* at 96-98.  That left us with the question we must answer in today's opinion in order to determine which payment schedule controls: Can the Consent Clause and the Writing Requirement be reconciled, and, if not, which controls?  *Id.* at 98-100.  The Israels argued that the Second Amendment binds Chabra because the Consent Clause is a form of anticipatory acceptance of modifications in the payment schedule, while Chabra argued that the Second Amendment is a modification of the underlying contract that discharges his obligations

6

under the Guaranty.  *Id.* at 98.  Noting that New York law generally holds guarantors bound by anticipatory agreements for an extension of time for performance, we had no trouble concluding that the Second Amendment fell within the scope of the Consent Clause, and that, even if it did not, Chabra could not claim discharge because of broader language in the Guaranty stating that it would remain in effect despite "any rescission, waiver, or modification of any of the terms or provisions of the Employment Agreement."  *Id.* at 98-99.  But we were unable to reconcile this interpretation with the Writing Requirement, which required Chabra to agree in writing to any amendments to the Employment Agreement that would affect his obligations.  *Id.* at 99.  We noted that the common-law "first clause governs" rule would have us apply the earlier clause in the contract (in this case, the Consent Clause) to the detriment of the latter, but that "doing so would require us to disregard a private statute of frauds created pursuant to New York statutory law," namely, N.Y. Gen. Oblig. Law § 15-301(1), which provides:  "A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent."  *Id.* at 100.  In order to resolve this conflict, we certified the following question to the New York Court of Appeals:

> Does New York General Obligations Law § 15-301(1) abrogate, in the case of a contract where the second of two irreconcilable provisions requires that any modifications to the agreement be made in writing, the common law rule that where two contractual provisions are irreconcilable, the one appearing first in the contract is to be given effect rather than the one appearing subsequent?

*Id.* at 102.  We added: "In formulating the question in this manner, we do not intend to limit the inquiry by the Court of Appeals, and we authorize that Court to expand, reformulate, or modify

7

this question and to extend its consideration to any other issue in this case as that Court sees fit."

*Id.*

The New York Court of Appeals accepted certification. *See Israel v. Chabra*, 11 N.Y.3d 744 (2008). In its subsequent opinion, it also accepted our invitation to reformulate the certified question, and did so as follows:

> Where the second of two conflicting provisions in a guaranty requires that any modification to the agreement underlying the guaranty be made in writing and signed by the guarantor, does New York General Obligations Law § 15-301(1) abrogate the common-law rules of contract interpretation that are traditionally used to determine which clause governs?

*Israel v. Chabra*, 12 N.Y.3d 158, 163 (2009). The Court of Appeals explained that the purpose of § 15-301(1) was to ensure that a contractual "no oral modification" clause would be enforceable, and to overturn the common-law rule that such clauses were unenforceable on the principle that – as Judge Cardozo put it – "[t]he clause which forbids a change, may be changed like any other." *Id.* at 163-64 (quoting *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 387-88 (1919)). The Court of Appeals found no support for the proposition that "the statute does more than merely allow for the enforcement of a clause banning oral modifications," and rejected the idea that "in the event of a conflict, the statute might require that a 'no oral modification' provision take precedence over other contract terms." *Id.* at 163. The Court of Appeals reviewed the subsequent relevant caselaw and legislative history – and we refer the reader to that Court's lucid and exceedingly helpful opinion for the details of its analysis of New York law – before it concluded that "when a 'no oral modification' clause purportedly conflicts with another clause in a contract, every attempt should be made to harmonize the two provisions using common-law tools of contract interpretation," but that "section 15-301(1) does not compel the enforcement of

8

a 'no oral modification' clause at the expense of other aspects of the parties' agreement." *Id.* at 167.

> The Court of Appeals then turned to the contract at issue in this case:

> [T]he writing requirement in the guaranty differs from the typical "no oral modification" clause. As the statute suggests, such clauses commonly preclude oral modification of the agreement in which they appear. But the writing requirement here does not discuss modification of the guaranty; rather, it is directed to subsequent amendments to the employment agreements. There is no claim in this case that the guaranty was modified, nor was the adoption of a new payment schedule necessarily an amendment of the guaranty since the latter does not contain a payment schedule. In any event, assuming the writing requirement falls under the purview of the statute, we conclude that General Obligations Law § 15-301(1) plays no role in determining whether the advance consent clause or the writing requirement takes precedence.

*Id.* at 167-68. Finally, the Court of Appeals explained why it had reformulated the certified question: it observed that it had not endorsed the "first clause governs" view of contract interpretation and it declined to do so in this case. *Id.* at 168. In a footnote, it quoted a leading treatise, which refers to the "first clause governs" rule as a "rule of last resort," and suggests that "[t]he better and apparent majority rule for resolving irreconcilable differences between contract clauses is to enforce the clause relatively more important or principal to the contract." *Id.* at 168 n.3 (quoting 11 Lord, Williston on Contracts § 32:15, at 507-10 (4th ed.)).

The Court of Appeals answered the reformulated certified question in the negative. *Id.* at 168. The parties have submitted supplemental letter briefs to us addressing the New York court's opinion. We now resolve this appeal.

## DISCUSSION

In *Israel I*, we invited the New York Court of Appeals, in addition to answering or reformulating the certified question, to "extend its consideration to any other issue in this case as

9

that Court sees fit." 537 F.3d at 102. It clarified that, to the extent that the "first clause governs" rule might apply in New York, it would be as a rule of last resort, and that it is better first to inquire which clause is more principal to the contract. This helpful clarification was within the scope of our invitation to the Court of Appeals, and we now consider whether identifying a more-principal clause in this case will resolve the appeal.

Preliminarily, however, both sides maintain that, notwithstanding our decision in *Israel I*, the Consent Clause and the Writing Requirement can still be reconciled. Chabra suggests that the Consent Clause represents a broad license later qualified by the Writing Requirement, and that there is no inherent inconsistency. We disagree. As we found in *Israel I*, the Consent Clause is best interpreted as an anticipatory agreement by Chabra to be bound regardless of future extensions of the payment schedule agreed to between the Israels and AMC without the involvement of any other parties (i.e., Chabra), but the Writing Requirement is best interpreted as a requirement that Chabra agree in writing before any future changes to the Employment Agreement affect his obligations. *See* 537 F.3d at 98-99. These are mutually exclusive propositions. An intelligible contract cannot give a party's advance consent to something and also require that party's future written consent for that something.

We also cannot agree with the Israels' proposed reconciliation, which would have us hold that the Writing Requirement sets up a rule that is then whittled to almost nothing by the Consent Clause. Israels rely upon *Green v. Doniger*, 300 N.Y. 238, 242 (1949), in which the New York Court of Appeals reconciled a no-oral-modification provision with a unilateral-termination provision by concluding that the parties had intended unilateral termination to be a sole exception to the no-oral-modification provision, *see id.* at 245. But we cannot follow this path here,

10

because, as we noted in *Israel I*, the Consent Clause goes beyond consenting to changes in time of payment and states that Chabra's obligations will continue even in the event of changes to "any other term of" his obligations (it was for this reason that we also could not resolve this case by applying the principle that a specific term controls over a general term). 537 F.3d at 99-100. The Israels attempt to characterize the Consent Clause as "carv[ing] out exceptions to the point where *almost* nothing is left," Appellees' Let. Br. at 3 (emphasis added), presumably because they realize it would be strange to speak of reconciling two clauses where one obliterates the other. But therein lies the problem with their argument – the Israels cannot explain what part of the Writing Requirement would survive on this reading, and neither can we. This interpretation would eliminate all vestiges of the Writing Requirement, and this is not reconciliation either.[1]

The clauses remain as irreconcilable as ever. Left unsettled by *Israel I* was not whether the clauses can be reconciled, but what rule we should apply to choose which must stand and which must fall. *See* 537 F.3d at 100 ("Try though we have, we cannot reconcile the Consent Clause and the Writing Requirement"). Application of the principles provided by the New York Court of Appeals leads us to conclude that the Consent Clause must be given effect at the expense of the Writing Requirement.

Under New York law, the general rule is that a surety's obligation is discharged if the creditor and the principal debtor agree to extend maturity of the debt, even for a few days,

---

[1] To the extent that the New York Court of Appeals relied upon *Green* in answering our certified question, it did so only to illustrate that New York's no-oral-modification statutes do not require no-oral-modification clauses to be given priority over other clauses in the same contract where the language chosen by the parties would suggest otherwise. *See Israel*, 12 N.Y.3d at 165-67. It did not suggest that any contrary presumption of precedence in favor of exceptions to no-oral-modification clauses should prevail instead. *Id.*

because suretyship is a contractual relationship and the creditor and principal debtor have substituted a new contract without the surety's consent. *See Bier Pension Plan Trust v. Estate of Schneierson*, 74 N.Y.2d 312, 315-16 (1989). A surety may, however, consent to an agreement between the creditor and principal debtor to extend the time for payment, and, if he does so, he is not relieved of his obligations as a guarantor. *See White Rose Food v. Saleh*, 99 N.Y.2d 589, 591-92 (2003). Such consent may be given in advance by inclusion of a consent clause, which typically uses words such as "absolute" or "unconditional" to describe the guarantor's obligation to pay even in the event of a change in the payment schedule. *See, e.g., CrossLand Fed. Sav. Bank v. A. Suna & Co.*, 935 F.Supp. 184, 201 (E.D.N.Y. 1996); *Republic Nat'l Bank of N.Y. v. Haddad*, 121 A.D.2d 986, 987 (1st Dep't 1986).

Given that the Guaranty was drafted against this legal backdrop, we find it difficult to believe that, whatever the parties may have intended by the broader language elsewhere in the Consent Clause, at least they did not intend the Clause to empower the Israels and AMC to amend the payment schedule without obtaining further express consent from Chabra, the guarantor. Not only does the language of the Consent Clause comport with other clauses found to have this effect, it only makes sense that the parties would contract for the ability to modify the payment schedule in this way, because AMC had, by the time the Guaranty was agreed to, replaced Chabra as the principal debtor. After this replacement was made, it was with AMC that the Israels as creditors would presumably have primarily needed to negotiate.

Furthermore, we think that the Consent Clause is more principal to the contract than the Writing Requirement. "It will normally be true ... that the purpose of a continuing guaranty is to enable parties who enter into contracts to be secure in the knowledge that whatever debts become

12

due them under the contracts will be protected by the guaranty." *Louis Dreyfus Energy Corp. v. MG Ref. and Mktg, Inc.*, 2 N.Y.3d 495, 503 (2004). Given this purpose, a consent clause, which preserves the abilities of the creditors both to negotiate with the principal debtor and to remain assured of any necessary repayment from the guarantor, will usually be more central to a guaranty than a writing requirement. Furthermore, because the Consent Clause would overturn a common-law rule (the dischargability of a surety upon substitution of a new contract), it is likely to be a more essential element of the contract than a clause that essentially ratifies a common-law rule (the Statute of Frauds, in private form). Of course, in a particular case, the circumstances surrounding the making of a guaranty may show that a writing requirement is more important than a consent clause. *Cf. First Trust Co. of Albany v. Dumary*, 23 N.Y.S.2d 532, 537 (N.Y. Sup. Ct. 1940) ("[I]t is the duty of the court to determine and give effect to the intention of the parties as ascertained by a fair and reasonable interpretation of the terms used and the language employed in the contract of guaranty, as read in the light of the attendant circumstances, and the purpose for which the guaranty was made ... .").

We are not persuaded by Chabra's contention that extrinsic evidence in the record demonstrates that the Writing Requirement was an essential, bargained-for provision of the Guaranty; the statements he points to in his affidavit on summary judgment before the district court are either conclusory or appear to refer to the intent of the parties in bargaining for the Notice Requirement, not the Writing Requirement. And even if the Writing Requirement was

13

bargained for, this would be insufficient to render it more central than the Consent Clause, which is a pillar of the primary purpose of the Guaranty.[2]

We thus hold that the Consent Clause constituted advance consent to the Second Amendment, that Chabra's obligations as Guarantor were not discharged by the adoption of the Second Amendment, and that the payment schedule in the Second Amendment controls. Because the district court erroneously held that the Notice Requirement was not a condition precedent to Chabra's obligations, and that notice was in any event not required for each missed payment, it never decided whether the Israels complied with the Notice Requirement as to individual missed payments. We therefore vacate the district court's judgment and remand the case for such further proceedings as are necessary, including but not limited to a determination of the Israels' compliance with their notice obligations. We note that we have left open the question of whether Chabra, as AMC's president, had actual notice of AMC's defaults, and we express no view on this question now. *See Israel I*, 537 F.3d at 95 n.4.

---

[2] Chabra also argues that, before the district court, the Israels submitted a memorandum of law to support their summary judgment motion which contended that the Second Amendment was subject to the Writing Requirement, did not bind Chabra, and had nothing to do with Chabra's Guaranty. However, judicial estoppel is not applicable because, *inter alia*, the district court did not adopt the Israels' position on the issue in question. *See Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96, 120 (2d Cir. 2005) ("We have previously held that 'judicial estoppel applies only when a tribunal in a prior separate proceeding has relied on a party's inconsistent factual representations and rendered a favorable decision.'" (quoting *Adler v. Pataki*, 185 F.3d 35, 41 n. 3 (2d Cir.1999)). Chabra argues that the Israels' former litigation position is evidence of the parties' intent. But in the absence of circumstances requiring us to apply judicial estoppel, our role in interpreting a contract is to give effect to the intent of the parties at the time of the contract's making, not the position they found it necessary to adopt during litigation.

14

**CONCLUSION**

We vacate the judgment of the district court, and we remand the case for further proceedings not inconsistent with this opinion.