[906 NE2d 374, 878 NYS2d 646]

MICHAEL ISRAEL et al., Respondents, v SURINDER S. CHABRA, Appellant, et al., Defendant.

Argued February 10, 2009; decided March 26, 2009

## POINTS OF COUNSEL

*Howard W. Burns, Jr.,* New York City, for appellant. I. The provision regarding any "rescission, waiver, or modification" may be reconciled with the written consent requirement relating solely to "modification." (*Rentways, Inc. v O'Neill Milk & Cream Co.,* 308 NY 342; *Allendale Mut. Ins. Co. v Excess Ins. Co. Ltd.,* 970 F Supp 265, 992 F Supp 271, 172 F3d 37; *Isaacs v Westchester Wood Works,* 278 AD2d 184.) II. If there is true irreconcilability, the Court must resolve it—blind choice of the earlier provision is a dinosaur. (*Queens Best, LLC v Brazal S. Holdings, LLC,* 35 AD3d 695; *Angelucci v City of New York,* 250 AD2d 716; *Raul Cleaners Corp. v Kim's Landmark Cleaners Corp.,* 210 AD2d 144; *Cramer v Devon Group, Inc.,* 774 F Supp 176; *Deering Milliken v Clark Estates,* 43 NY2d 545; *Cheng*

*Sing Liang v Chwen Jen Huang,* 255 AD2d 671; *Honigsbaum's, Inc. v Stuyvesant Plaza,* 178 AD2d 702; *Matter of Brooklyn Trust Co.,* 163 Misc 117.) III. New York has a strong legislative policy in enforcing no oral modification clauses. (*Beatty v Guggenheim Exploration Co.,* 225 NY 380; *Schwartzreich v Bauman-Basch, Inc.,* 231 NY 196; *DFI Communications v Greenberg,* 41 NY2d 602.)

*Sklover, Donath & Felber, LLC,* New York City (*Alan L. Sklover, Daniel A. Fried* and *Susan R. Nudelman* of counsel), for respondents. I. General Obligations Law § 15-301 (1) does not require a no oral modifications provision of an instrument to prevail over conflicting provisions of the same instrument. (*Cammack v Slattery & Bro.,* 241 NY 39; *McKenzie v Harrison,* 120 NY 260; *Coe v Hobby,* 72 NY 141; *Beatty v Guggenheim Exploration Co.,* 225 NY 380; *Hechter v New York Life Ins. Co.,* 46 NY2d 34; *Rust v Reyer,* 91 NY2d 355; *Green v Doniger,* 300 NY 238.) II. General Obligations Law § 15-301 (1) does not apply to the writing requirement of the guaranty. (*Associated Food Stores v Siegel,* 10 AD2d 1003, 9 NY2d 816; *National Union Fire Ins. Co. of Pittsburgh, Pa. v Williams,* 223 AD2d 395; *Ripley v International Rys. of Cent. Am.,* 8 NY2d 430; *Generale Bank v Czarnikow-Rionda Sugar Trading, Inc.,* 47 F Supp 2d 477; *Bank of Tokyo-Mitsubishi, Ltd., N.Y. Branch v Kvaerner a.s.,* 243 AD2d 1; *Rudman v Cowles Communications,* 30 NY2d 1; *SAA-A, Inc. v Morgan Stanley Dean Witter & Co.,* 281 AD2d 201; *Goodyear Publ. Co. v Mundell,* 75 AD2d 556; *Imperator Realty Co. v Tull,* 228 NY 447; *Hill v Blake,* 97 NY 216.) III. The consent clause should be construed as limiting the scope of the writing requirement. (*Green v Doniger,* 300 NY 238; *Aramony v United Way of Am.,* 254 F3d 403; *Muzak Corp. v Hotel Taft Corp.,* 1 NY2d 42; *Bank of Tokyo-Mitsubishi, Ltd., N.Y. Branch v Kvaerner a.s.,* 243 AD2d 1; *Matter of Riefberg,* 58 NY2d 134; *242-44 E. 77th St., LLC v Greater N.Y. Mut. Ins. Co.,* 31 AD3d 100; *Pittsburg & Shawmut R.R. Co. v Central Trust Co.,* 156 App Div 182.)

**OPINION OF THE COURT**

GRAFFEO, J.

In this certified question case from the United States Court of Appeals for the Second Circuit, we are asked to determine whether General Obligations Law § 15-301 (1) affects the interpretation and enforcement of a contract. We begin with the facts underlying the contract dispute.

Plaintiffs Michael and Steven Israel were formerly employed by AMC Computer Corporation. In the spring of 2000, AMC

was in the process of merging with a third-party investor. Because plaintiffs—a father and son—were key employees, the investor sought assurances that they would remain with AMC for at least three years after the merger. On May 1, 2000, plaintiffs entered into separate but virtually identical three-year employment agreements with AMC. Defendant Surinder "Sonny" Chabra, the president of AMC, executed the contracts in his corporate capacity. In addition, Chabra signed a "Letter of Intent" agreeing that, if the merger went forward, "Steven and Michael Israel each will be entitled to a $2 million bonus payment, for past services rendered, to be paid by Sonny Chabra." The payments were to be made in equal monthly installments over the period covered by the employment contracts.

The employment agreements and the letter of intent were modified on July 31, 2000 in documents known as "Amendment No. 1 to Employment Agreement" and "Amendment No. 1 to Letter of Intent." The amendments reduced plaintiffs' bonuses to $1.75 million and transferred the obligation to make the payments from Sonny Chabra, in his personal capacity, to AMC. In the amended letter of intent, the parties further agreed that Chabra would personally guarantee the bonus payments and, about a month later, Chabra executed personal guarantees requiring him to cover any default upon 60 days' notice of AMC's failure to make an installment payment to either of the Israels. The guarantees stated that Chabra's liability was "absolute and unconditional" regardless of "any change in the time, manner or place of payment" (a provision referred to as the "advance consent clause") or of "any rescission, waiver, or modification of any of the terms or provisions of the Employment Agreement." The last sentence of the guarantees (referred to as "the writing requirement") provided: "References to the Employment Agreement shall mean the Employment Agreement immediately after the execution of Amendment No. 1 and shall not be affected by subsequent amendments to the Employment Agreement unless Guarantor has agreed in writing to such amendments."

The merger occurred on August 30, 2000 and, under the amended agreements, plaintiffs began to receive bonus payments later that year. Over the next $2^{1}/_{2}$ years, AMC failed to make certain installment payments, causing plaintiffs to issue default notices to AMC and Chabra. To resolve the disputes over the missed payments, AMC entered into a "Second

Amendment to Employment Agreement" with each plaintiff that included a new payment schedule for the balances due on the bonuses. The parties also agreed that Chabra's personal guarantees would remain in effect. Chabra signed these amendments as president of AMC but not in his personal capacity.

AMC made some payments under the new schedule but ultimately ceased making any payments, prompting plaintiffs to forward default notices to AMC and Chabra. After an unsuccessful effort to arbitrate, plaintiffs pursued this action in the United States District Court for the Southern District of New York seeking enforcement of the Chabra guarantees. The parties cross-moved for summary judgment and the District Court granted judgment in favor of plaintiffs, holding that Chabra was personally obligated to pay the remaining balances on the bonus payments (418 F Supp 2d 509 [2006]).

On appeal, the Second Circuit disagreed with the District Court's analysis in several respects (*Israel v Chabra*, 537 F3d 86 [2d Cir 2008]). Relevant to this appeal, since Chabra had signed the second amendment documents only in his capacity as president of AMC, the Second Circuit rejected the District Court's finding that he was personally bound by the new payment schedule. The court further reasoned that plaintiffs' failure to send default notices when payments were not made under the prior schedule might preclude recovery of some installments.

Focusing on the language in the guaranty documents, the Second Circuit viewed the advance consent clause as an agreement by Chabra to be bound by subsequent changes in the "time, manner or place of payment." But the court found this provision irreconcilable with the writing requirement, construing the latter to preclude the enforcement of unsigned modifications of the employment agreement which, in light of Chabra's failure to sign in his personal capacity, included the revised payment schedule. The court interpreted New York law to require that when two provisions in a contract conflict, the provision that appears earliest in the contract should be given effect. In this case, that would mean that the advance consent clause would govern. But the Second Circuit was concerned that General Obligations Law § 15-301 (1)—a statute that provides for the enforcement of "no oral modification" clauses in contracts—might require that the writing requirement supersede the advance consent clause. Thus, the Second Circuit certified the following question to us:

"Does New York General Obligations Law § 15-301(1) abrogate, in the case of a contract where the second of two irreconcilable provisions requires that any modifications to the agreement be made in writing, the common law rule that where two contractual provisions are irreconcilable, the one appearing first in the contract is to be given effect rather than the one appearing subsequent?" (*Id.* at 102.)

The Second Circuit authorized our Court "to expand, reformulate, or modify this question" (*id.*) and we have accepted both the certification and the invitation to reframe the inquiry. We now reformulate the question to read:

Where the second of two conflicting provisions in a guaranty requires that any modification to the agreement underlying the guaranty be made in writing and signed by the guarantor, does New York General Obligations Law § 15-301 (1) abrogate the common-law rules of contract interpretation that are traditionally used to determine which clause governs?

We answer this question in the negative.

General Obligations Law § 15-301 (1) provides:

"A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent."

The statute indicates that where a contract contains a "no oral modification" clause, that clause will be enforceable. The Second Circuit has inquired whether the statute does more than merely allow for the enforcement of a clause banning oral modifications, questioning whether, in the event of a conflict, the statute might require that a "no oral modification" provision take precedence over other contract terms. We conclude that the language in the statute does not support that interpretation, nor does the legislative history reveal any such legislative intent.

Under the common law, a contractual "no oral modification" clause was not enforceable because contracting parties were viewed as being able to waive such a clause, thereby orally amending their written agreement. As Judge Cardozo explained in *Beatty v Guggenheim Exploration Co.* (225 NY 380, 387-388 [1919] [citations and internal quotation marks omitted]):

"Those who make a contract, may unmake it. The clause which forbids a change, may be changed like any other. The prohibition of oral waiver, may itself be waived. Every such agreement is ended by the new one which contradicts it . . . What is excluded by one act, is restored by another. You may put it out by the door; it is back through the window. Whenever two men contract, no limitation self-imposed can destroy their power to contract again."

Since "no oral modification" clauses were not given effect under the common law, the only way to ensure that a written contract could not be changed through oral modification was to enter it under "seal" (*see Cammack v Slattery & Bro.*, 241 NY 39, 45-46 [1925]).[1] But, by the early twentieth century, use of the seal had become increasingly obsolete, as we noted in *Cammack*:

"While much has been said about the anachronistic absurdity of giving to seals at the present day the solemnity and force which they once justly possessed and while courts have undoubtedly been quite ready to escape from an alleged invalidity of a contract predicated upon failure to use a seal, nevertheless this court has been unwilling to make a decision generally annulling and destroying well-settled rules pertaining to the use of seals . . . If the use of seals as now required is to be generally discontinued this result should be accomplished by the Legislature, which could make proper reservations preserving the integrity and force of contracts already executed" (*id.* at 45-46).

Accepting this Court's suggestion, the Legislature passed a series of statutes in the 1930s that were intended to reduce the significance of the seal in some situations and altogether remove its effect in others. Yet there were ambiguities in these provisions that resulted in uncertainty concerning their enforcement (1941 NY Legis Doc No. 65 [M], at 13, discussing *Cochran v Taylor*, 273 NY 172 [1937]). It was against this backdrop that the Legislature passed the predecessor to General Obligations Law § 15-301 (1).

---

**1.** Originally, under the common law, a seal was an impression made in wax or embossed on paper and affixed to a document (Garner, A Dictionary of Modern Legal Usage 784-785 [2d ed 1995]).

In 1941, at the recommendation of the New York Law Revision Commission, a statute was enacted that clearly abrogated the significance of the sealed document except in certain limited situations.[2] At the same time, the Legislature adopted the predecessors to General Obligations Law § 15-301 (1)—two identically worded provisions that were codified as former Real Property Law § 282 and former Personal Property Law § 33-c:

> "An executory agreement hereafter made shall be ineffective to change or modify, or to discharge in whole or in part, a written agreement or other written instrument hereafter executed which contains a provision to the effect that it cannot be changed orally, unless such executory agreement is in writing and signed by the party against whom enforcement of the change, modification or discharge is sought" (L 1941, ch 329, §§ 4, 5).

There is no doubt that this language "was intended in part to compensate for the demise of the seal" (*DFI Communications v Greenberg*, 41 NY2d 602, 606 [1977]). In its report urging enactment, the Law Revision Commission explained: "The seal has degenerated into an L. S. or other scrawl which, in modern practice, is frequently a printed L. S. upon a printed form. To the average man it conveys no meaning, and frequently the parties to instruments upon which it appears have no idea of its legal effects" (1941 NY Legis Doc No. 65 [M], at 15). The Commission asserted that "a method more appropriate than the use of the seal for permitting a party to a written agreement to protect himself against the danger of false claims of an oral modification, would be to make binding a stipulation to this effect contained in the original written instrument" (*id.*). This stance was echoed by the Association of the Bar of the City of New York, which supported the proposed legislation and observed that it "would change the effect of such decisions as that of *Beatty* v. *Guggenheim Exploration Co.*" (Mem of Assn of Bar of City of NY Comm on State Legislation, Bill Jacket, L 1941, ch 329, at 7).

Eight years after passage of the "no oral modification" statutes, we decided *Green v Doniger* (300 NY 238 [1949]), a

---

**2.** The law stated: "Except as otherwise expressly provided by statute, the presence or absence of a seal upon a written instrument hereafter executed shall be without legal effect" (L 1941, ch 329, § 2, adding former Civ Prac Act § 342).

case involving the interpretation of a written contract between a salesperson and his employer. The contract contained both a "no oral modification" clause and a provision that allowed either party to terminate the agreement upon 30 days' written notice to the other. Although plaintiff, the salesperson, was not entitled to a bonus under the terms of the written contract, he alleged that he and his employer had mutually agreed to abandon the written contract one month after it was executed in favor of an oral agreement that provided him with a bonus. The employer moved to dismiss plaintiff's claim, arguing that, since there was no evidence that either party had notified the other in writing of an intent to terminate the contract, the written agreement remained in effect and its "no oral modification" clause precluded any bonus.

We held that former Personal Property Law § 33-c (1)—a predecessor to General Obligations Law § 15-301 (1)—did not prevent plaintiff from pursuing his claim. The Court reasoned that, if the "no oral modification" clause had been the only relevant provision in the contract, the statute would require its enforcement, thereby defeating plaintiff's claim under the purported subsequent oral contract. But the "no oral modification" clause was necessarily limited by the provision allowing termination upon 30 days' written notice. Under the termination clause, either party could unilaterally discharge the contract without the signature or consent of the other. We therefore determined that the "no oral modification" statute applied only to the extent that the parties had incorporated it into their contract; it had no independent effect on the parties' obligations, nor did it trump competing provisions within the same document. Since plaintiff's theory was not that the parties had orally modified the written agreement but that the written agreement had been vacated by mutual agreement—with the employer having waived the written notice requirement in the termination clause—we concluded that the employer could not rely on the "no oral modification" clause to defeat plaintiff's claim.

In the aftermath of *Green*, the Legislature added provisions to the statute specifically addressing "termination upon written notice" clauses (L 1952, ch 831). The new subdivisions provided that, when parties agree that a written contract can be terminated on written notice (or that the agreement cannot be terminated orally), the requirement that the notice be written cannot be waived except in writing, nor can the parties

mutually consent to abandon the contract and substitute another in its place unless there is a writing signed by the party against whom the termination or abandonment is sought to be enforced (L 1952, ch 831, adding provisions currently codified at General Obligations Law § 15-301 [2], [3], [4]). And, without altering the substance of the provision, the Legislature also reorganized the language in the "no oral modification" subdivision so that it reads as it does today.

The Legislature's response to *Green* is notable not solely because of what it did but also because of what it did not do. In amending the statute, the Legislature addressed the "termination on written notice" issue raised in *Green*. But it did not disturb our determination that the statute's impact on a dispute, if any, depends entirely on the language the parties chose in their contract. As a proponent of the legislation, the Law Revision Commission concurred with this aspect of the Court's analysis, acknowledging that "the intent of the parties, as ascertained from the terms of the contract, governs the applicability of the statute" (1951 NY Legis Doc No. 65 [N], at 18).

This legislative history reveals that, in drafting General Obligations Law § 15-301 (1), the Legislature did not intend to interfere with the ability of parties to craft specific contract terms governing their rights; if parties decide to include a "no oral modification" clause in their agreement, the statute is intended to facilitate its enforcement. Section 15-301 (1) places this type of clause on the same footing as any other term in a contract. However, nothing in the history of the statute suggests that the Legislature sought to abrogate other common-law rules related to the interpretation of contracts, other than to extinguish the *Beatty* rule. As *Green* makes clear, when a "no oral modification" clause purportedly conflicts with another clause in a contract, every attempt should be made to harmonize the two provisions using common-law tools of contract interpretation. But section 15-301 (1) does not compel the enforcement of a "no oral modification" clause at the expense of other aspects of the parties' agreement.

Turning to the contract in this case, the writing requirement in the guaranty differs from the typical "no oral modification" clause. As the statute suggests, such clauses commonly preclude oral modification of the agreement in which they appear. But the writing requirement here does not discuss modification of the guaranty; rather, it is directed to subsequent amendments to the employment agreements. There is no claim in this case

that the guaranty was modified, nor was the adoption of a new payment schedule necessarily an amendment of the guaranty since the latter does not contain a payment schedule. In any event, assuming the writing requirement falls under the purview of the statute, we conclude that General Obligations Law § 15-301 (1) plays no role in determining whether the advance consent clause or the writing requirement takes precedence.

■ Finally, although we have not been asked to interpret the language in the guaranty, we note that this Court has not endorsed the "first clause governs" view of contract interpretation and we decline to do so now.[3] Therefore, we have modified the certified question to remove any reference to that principle.

Accordingly, as reformulated, the certified question should be answered in the negative.

Judges CIPARICK, READ, SMITH, PIGOTT and JONES concur; Chief Judge LIPPMAN taking no part.

Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of the Rules of Practice of the Court of Appeals (22 NYCRR 500.27), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question, as reformulated, answered in the negative.

---

**3.** As stated in 11 Lord, Williston on Contracts § 32:15:

"Historically, one of the first answers provided by the courts for how to deal with conflicting clauses was to enforce the earlier clause and disregard the later. This approach is still followed today. Because of the arbitrary and artificial quality of this rule of interpretation, it is not universally followed and will only be accepted as a rule of last resort . . .

"The better and apparent majority rule for resolving irreconcilable differences between contract clauses is to enforce the clause relatively more important or principal to the contract. This rule is tempered by the corollary that the more specific clause controls the more general" (11 Lord, Williston on Contracts § 32:15, at 507-510 [4th ed]).