■ PHILLIP GOOTEE, Respondent, v GLOBAL CREDIT SERVICES, LLC, Appellant. [32 NYS3d 105]—

Order, Supreme Court, New York County (Jeffrey K. Oing, J.), entered June 25, 2014, which granted plaintiff's motion for summary judgment with respect to liability for breach of contract and dismissing defendant's counterclaim, referred the issue of damages to a special referee or judicial hearing officer to hear and report, and denied defendant's motion for summary judgment on its counterclaim, modified, on the law, to deny plaintiff's motion for summary judgment, and otherwise affirmed, without costs.

By letter agreement dated September 26, 2008, defendant hired plaintiff to be its president (the employment agreement). The terms of employment provided, inter alia, that plaintiff was to receive: an annual salary "[p]ayable at the gross rate of $275,000 per year"; a bonus of 3% on new "ARMZ" contracts paid monthly; medical and other insurance benefits; a housing allowance of $25,000 "to be paid in 24 equal payments per year"; 375,000 shares of class B stock, to vest 125,000 units per year; a $50,000 loan, forgivable on specified terms (the forgivable loan); a $250,000 separation payment, subject to reduction on specified terms; and 25 vacation days per year. The employment agreement also provided that plaintiff would be subject to the confidentiality and nonsolicitation provisions set forth in an agreement annexed thereto.

The employment agreement did not state a fixed duration for

plaintiff's employment or that he could only be terminated for cause. Nor did it expressly state that plaintiff was an "at-will employee." However, it contained a provision that prohibited modification of "any provision" thereof without "a writing signed by the party against whom enforcement is sought" (the no oral modification clause).

In conformity with the no oral modification clause, on September 16, 2009, the parties executed a "First Amendment" to the employment agreement, which reduced plaintiff's salary to $150,000 and increased his ARMZ bonus from 3% to 7.5%. The housing allowance was changed to $4,000 per month, payable on the first day of each month. A "Retention Loan" of $90,000 was added, which, along with the forgivable loan, would be forgiven over a three-year period in three equal installments beginning on January 1, 2011, provided that plaintiff was employed by defendant on the anniversary dates. The separation payment was deleted.

Plaintiff was removed as president in February 2010. For the next six months, he continued to attend conferences and trade shows on defendant's behalf and was paid a reduced salary and benefits. After efforts to negotiate a written consulting agreement to supersede the employment agreement failed, in July 2010, plaintiff wrote defendant a letter that included a notice to cure alleging that defendant had breached the employment agreement. In August 2010, defendant drafted a revised consulting agreement, which plaintiff rejected. After defendant stopped paying him, plaintiff commenced this action asserting claims for breach of contract based on the failure to pay the salary, bonus, housing allowance, insurance premiums, and stock allegedly due under the employment agreement.

While the employment agreement does not state a fixed duration, plaintiff alleges in his complaint that "[i]t was agreed by the parties that the contract was to run no less than five (5) years." Defendant denies liability on the ground that it had the right to alter the terms of plaintiff's employment because it was "at will," and asserts counterclaims for the repayment of the forgivable and retention loans.

Supreme Court granted plaintiff summary judgment on liability and referred the issue of damages to a special referee or JHO to hear and report. It denied defendant summary judgment on its counterclaim. While finding that the employment agreement was unambiguous and created an "at-will employment . . . terminable at any time by either the Plaintiff or the Defendant," the court held that "it[ ] still is governed by [its] terms," which "provide[ ] [for] no modification, amendment,

extension, discharge, termination or waiver of any provision . . . unless the same shall be in writing, signed by the party against enforcement is sought." Thus, although it rejected plaintiff's argument that the no oral modification clause provided "a duration of time," the court held that when defendant removed plaintiff as president in February 2010 and altered his salary and benefits without a signed writing, it violated the no oral modification clause and breached the employment agreement. The court stated further: "With respect to damages, I had asked Plaintiff's Counsel how far out we are going because if it's infinite, he has a problem. He says there is age 67 is where he goes or where the damages go to, so that's where we are at and I believe he represents the Plaintiff is 67 so that's where we are at in terms of figuring out the damages."

"[A]bsent an agreement establishing a fixed duration, an employment relationship is presumed to be a hiring at will, terminable at any time by either party" (*Sabetay v Sterling Drug*, 69 NY2d 329, 333 [1987]; *Rooney v Tyson*, 91 NY2d 685, 689 [1998]). The presumption can be rebutted by evidence of a limitation on the employer's right to discharge the employee at will (*Weiner v McGraw-Hill, Inc.*, 57 NY2d 458 [1982]; *Talansky v American Jewish Historical Socy.*, 8 AD3d 150 [2004]).

The inclusion of the no oral modification clause in the employment agreement does not, in and of itself, suffice to rebut the at-will presumption. While the clause precluded the modification of "any provision" of the agreement without a writing signed by the party against whom enforcement was sought, there is no express provision in the agreement that precluded defendant from terminating plaintiff without cause. However, as Supreme Court found, the no oral modification clause is an enforceable contract term even if the employment was at will (*see JCS Controls, Inc. v Stacey*, 57 AD3d 1372, 1373 [4th Dept 2008] ["terms set forth in the . . . employment agreement, which was signed by plaintiff's president, are binding on plaintiff despite defendant's status as an at-will employee"]; *see also Israel v Chabra*, 12 NY3d 158, 163 [2009] [General Obligations Law § 15-301 (1) "indicates that where a contract contains a 'no oral modification' clause, that clause will be enforceable"]).

General Obligations Law § 15-301 (1) provides that "[a] written agreement . . . which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of

the change is sought or by his agent." Although a no oral modification clause does not take precedence over other contract terms, "Section 15-301 (1) places this type of clause on the same footing as any other term in a contract" (*Israel v Chabra*, 12 NY3d at 167). "[W]hen a 'no oral modification' clause purportedly conflicts with another clause in a contract, every attempt should be made to harmonize the two provisions using common-law tools of contract interpretation" (*id.*). Here, consistent with the no oral modification clause, the parties, through their course of conduct, confirmed the need for "a writing signed by the party against whom enforcement is sought" in order to effect any change or modification to the express provisions of the agreement, such as those relating to plaintiff's duties and compensation (*see Firtell v Update, Inc.*, 17 Misc 3d 1101[A], 2007 NY Slip Op 51786[U] [Sup Ct, NY County 2007]). This course of conduct includes the execution of the written amendment to the employment agreement in September 2009 and the commencement of negotiations to draft a new agreement to supercede the employment agreement when plaintiff's duties changed in February 2010.

Nevertheless, while the court correctly found that the no oral modification clause was enforceable and barred defendant from unilaterally altering the terms of plaintiff's employment agreement without a writing, issues of fact exist that preclude the granting of summary judgment in plaintiff's favor. These include whether or not defendant terminated plaintiff's employment or merely modified it when it removed plaintiff as president in February 2010, whether plaintiff waived the no oral modification clause by partially performing an alleged oral agreement to become a consultant at a reduced salary (*see Rose v Spa Realty Assoc.*, 42 NY2d 338 [1977]), and, if plaintiff was not terminated and did not waive the clause, the period for which he is entitled to damages.

The dissent would go further and grant defendant summary judgment dismissing the complaint and on its counterclaim for the repayment of the loans, based on its belief that the record establishes as a matter of law that defendant exercised its right to terminate plaintiff's at-will employment no later than February 2010, when it changed plaintiff's title, duties and compensation, and plaintiff chose to remain in its employ. However, none of the cases cited by the dissent in support of its position appear to discuss the effect of a no oral modification clause on an employer's right to alter the terms of employment.

The dissent agrees that the no oral modification clause is

enforceable but finds that its application is limited to preventing defendant from "unilaterally reducing [plaintiff]'s compensation while requiring him to perform substantially the same job." However, no such limitation is contained in the clause, which provides: "No modification, amendment, extension, discharge, termination or waiver of *any provision* of this letter agreement shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought and then such waiver shall be effective only in the specific instance, and for the purpose, for which given" (emphasis added).

By this unambiguous language, defendant gave up any right it had to modify plaintiff's duties, compensation and benefits, without a writing signed by plaintiff.

Contrary to the dissent, the record does not establish that defendant "validly" terminated, rather than modified, the employment agreement in February 2010. Although the record reflects that plaintiff's duties and compensation changed at that time, plaintiff asserts that it was his belief that the employment agreement allowed defendant to change his title and responsibilities. Plaintiff also asserts that when defendant's majority owner told him he could only afford to pay him $4,500 per month and had to reduce his benefits, he accepted the changes to avoid a confrontation but did not waive his rights to enforce the employment agreement by doing so, believing that defendant's changes to the employment agreement were a breach of contract.

The first proposed consulting agreement drafted by defendant in June 2010 supports plaintiff's contention that the employment agreement had yet to be terminated at that point in time and that the parties were negotiating a new written agreement to effectuate the change in plaintiff's duties and compensation, as required by the no oral modification clause. In particular, the draft states in the first "Whereas" clause that "[t]he Consultant [i.e., plaintiff] and the Company *desire to end* Consultant's employment relationship with the Company." Paragraph 1 provides that: "except as may be set forth herein, the terms, conditions, rights and obligations set forth in the [original 2008 agreement and 2009 amendment] are superseded, of no force and effect, null and void *as of the date this Consulting Agreement is executed.* Consultant and the Company further agree that the following terms and conditions shall take effect immediately upon execution of this Consulting Agreement and will govern the relationship between Consultant and the Company, *notwithstanding the continued ap-*

*plicability of Employment Agreement Exhibit C to such relationship as set forth below"* (emphasis added).

The dissent contends that these statements are "merely legal conclusions . . . which do not change the facts of record establishing that [defendant] terminated the letter agreement in February 2010." However, by this language, defendant made statements of fact, acknowledging that the employment agreement had yet to be terminated and would remain in effect until a consulting agreement was executed and that certain provisions of the employment agreement would survive even after a consulting agreement was executed.

The dissent's reliance on an email defendant sent to plaintiff on August 30, 2010 as proof that the employment relationship between the parties was terminated in February 2010 is misplaced. The record shows that when plaintiff rejected defendant's June 2010 draft consulting agreement in July 2010, he wrote defendant a letter in which he asserted that defendant had breached the employment agreement and that he had told defendant in February 2010 that he "would not waive any [of its] provisions." As to the purported breaches, plaintiff identified the reduction of his salary from $150,000 to $54,000 per year without his consent, defendant's failure to pay the ARMZ bonuses, medical and insurance coverage, and the housing allowance, and defendant's failure to issue the 375,000 shares of stock, of which 125,000 shares were fully vested.

After waiting over a month, defendant sent plaintiff a revised consulting agreement dated August 24, 2010, in which it changed its position, now stating that "[t]he Consultant and the Company ended Consultant's employment relationship as President of the Company in February 2010," that "[t]he parties . . . reached agreement upon [the terms of the consulting agreement] in February 2010 and have been operating under these terms . . . since February 2010," and that "except as may be set forth herein, the terms, conditions, rights and obligations set forth in the [original 2008 contract and 2009 amendment] are superseded, of no force and effect, null and void as of January 1, 2010 in accordance with the agreement reached between [the parties] in February 2010." On August 30, 2010, defendant sent plaintiff the follow-up email relied on by the dissent, in which it reiterated its revised position that the employment relationship had terminated in February 2010. However, plaintiff disputed defendant's assertions and rejected the revised offer, stating: "To be very clear on this point, I have never conceded any of my rights under my employment contract. Last February, Andy told me that 'all the budget could

afford to pay me was $4,500 per month'. He also told me that my duties and title were being changed by the Board, and that going forward my title would be 'Director of Industry Affairs.' I certainly did not agree to the drastic reduction in salary and benefits Andy was unilaterally implementing, however, I did agree that I wanted to avoid a confrontation if at all possible. Andy and I agreed that we both wanted a long term relationship. He said he hoped it would be at least five years. Since that time, I have been attempting, albeit unsuccessfully, to reach an agreement with [defendant] that would avoid a confrontation and provide for our continuing relationship." Plaintiff further stated that "it seems to me the real question for us to decide by tomorrow is whether or not we wish to move forward together. If yes, then we should try to reach an acceptable settlement of my existing contract and the terms of the new contract. If no, and [defendant] simply intends to terminate our relationship, it must address the obligations it has incurred under my existing employment contract."

Furthermore, when plaintiff was asked at his deposition if defendant had ended its employment relationship with him as president in February 2010, as stated in the August 30, 2010 email, plaintiff replied, inter alia, that: "[i]t did not end my employment relationship, but assigned different duties to me"; that "[t]he portion that made reference that it ended my employment relationship is not correct. They did change my duties, but they did not end my employment relationship"; and that "the wording of that sentence is inappropriate and inaccurate. The correct statement would be, the company changed your responsibilities and duties as of February 2010. It is not accurate that the company ended my employment relationship as of February 2010." Plaintiff further testified that while negotiations commenced in February 2010, he did not agree to any terms of his continued employment as either an employee or consultant at that time.

On the other hand, the employment agreement states that plaintiff will be responsible for the overall management and supervision of the Company "as well as such other duties and responsibilities as may from time to time be assigned by the Managers of the Company." However, plaintiff was removed as president, and, rather than assuming additional duties, he took over a completely different role, acting as a consultant. Defendant asserts that this terminated the employment relationship and created a new consulting relationship and that the first time that plaintiff objected to the new arrangement was six months after it went into effect. Furthermore,

plaintiff acknowledged that he reached some kind of understanding with defendant, stating in his July 2010 letter: "Our discussions also resulted in a change in my title from President to Director of Industry Affairs. In that role, you felt that I would best serve the company by representing it at various conventions, seminars, and trade association conferences, both as a speaker and attendee, a role I have actively pursued. Per our agreement, I am fulfilling my duties from my home, and you and I envisioned and hoped we would have a five year relationship."

Thus, it cannot be determined as a matter of law that defendant fired and then rehired plaintiff in February 2010, as the dissent asserts. Rather, issues of fact exist as to if and when defendant terminated the employment agreement and entered into a new relationship to which plaintiff agreed.

The dissent posits that the finding of an issue of fact contradicts our own recognition that plaintiff was an at-will employee. However, the dissent itself states that "[g]iven that the letter agreement was terminable at will, the next question that arises is, when was it terminated?" While the dissent believes that termination occurred when plaintiff went from president to part-time consultant, the fact that we disagree with that conclusion, and find an issue of fact in that regard, in no way contradicts our finding that the employment relationship was at will.

Contrary to the dissent, it cannot be said that plaintiff's performance of his new duties from February 2010 onward is, as a matter of law, unequivocally referable to his acceptance of defendant's modifications of his rights under the employment agreement and therefore a waiver of the no oral modification clause (*see Rose v Spa Realty Assoc.*, 42 NY2d at 343-344). "[I]n order to be unequivocally referable, conduct must be inconsistent with any other explanation" (*Richardson & Lucas, Inc. v New York Athletic Club of City of N.Y.*, 304 AD2d 462, 463 [1st Dept 2003]). In other words, "the actions alone must be 'unintelligible or at least extraordinary,' explainable only with reference to the oral agreement" (*Anostario v Vicinanzo*, 59 NY2d 662, 664 [1983]). Given plaintiff's protests and the conflicting evidence as to if and when the agreement was terminated, it cannot be determined as a matter of law whether or not plaintiff's performance of his modified duties from February 2010 onward was unequivocally referable to a new oral agreement (*compare Kronick v L.P. Thebault Co., Inc.*, 70 AD3d 648, 649 [2d Dept 2010] ["By remaining in the defendant's employ under the new compensation terms, the plaintiff is

deemed to have accepted them regardless of her failure to sign the notice advising her of the new terms" (internal citations omitted)], *with Tierney v Capricorn Invs.*, 189 AD2d 629, 631 [1st Dept 1993], *lv denied* 81 NY2d 710 [1993] ["Plaintiff's performance here, however, would be equally consistent with his desire to continue to earn his compensation under the written Employment Agreement, as with the alleged oral modification"]).

Even if defendant had breached the employment agreement, issues of fact would exist as to the period for which plaintiff is entitled to damages, and the court erred when it held that plaintiff had established his entitlement, as a matter of law, to damages until he reached age 67. Although plaintiff's subjective belief may have been that this would be his last job, there is nothing in the agreement to support the conclusion that defendant agreed to keep plaintiff on for as long as plaintiff wanted the job. Furthermore, although plaintiff contends that the agreed-upon term was five years, various clauses in the employment agreement appear to be tied to lesser time periods.

Finally, until it is determined whether defendant breached the employment agreement, and whether that breach prevented plaintiff from being employed by defendant as of January 1, 2011, 2012, and 2013, it cannot be determined whether either party is entitled to summary judgment with respect to the loans. Concur— Andrias, Gische and Kapnick, JJ.

Friedman, J.P., and Saxe, J., dissent in part in a memorandum by Friedman, J.P., as follows: Although I concur with the majority insofar as it modifies the order appealed from to deny plaintiff Philip Gootee's motion for summary judgment, I would go further and grant the motion by defendant Global Credit Services, LLC (GCS) for summary judgment dismissing the complaint and granting it judgment on its counterclaim for repayment of certain loans. In my view, and as I hope will be made clear in the discussion below, there is an inherent contradiction in the majority's position. The majority correctly holds that the written agreement under which Gootee was originally hired as president of GCS in 2008 was terminable by either party at will. At the same time, however, the majority somehow finds that an issue of fact exists as to whether that written agreement was terminated in February 2010, thus ignoring the uncontroverted evidence that the parties ceased to operate under the terms of that written agreement from that point forward, with Gootee accepting his demotion from president to part-time consultant. These undisputed facts establish, in my view, that the 2008 written agreement was

validly terminated in February 2010. Because Gootee cannot recover from GCS for breach of an agreement that had already been terminated at the time of the alleged breaches, GCS should be granted summary judgment dismissing the complaint.

As the majority correctly notes, the relationship between the parties, under their September 2008 letter agreement, as amended in writing in September 2009 (collectively, the letter agreement), was one of employment at will, since the letter agreement specified neither a fixed term for Gootee's employment as GCS's president nor an event to trigger its termination. Neither did the letter agreement require that GCS have cause to terminate Gootee. Further, the at-will character of GCS's employment of Gootee was not changed by the provision of the letter agreement requiring that any "modification, amendment, extension, discharge, termination or waiver of any provision of this letter agreement . . . be in a writing signed by the party against whom enforcement is sought."[1] By its terms, this provision (the no-oral-modification clause) applies only to changes to *any provision* of this letter agreement," not to a termination of the letter agreement altogether (emphasis added). Since the letter agreement elsewhere recognizes GCS's right to terminate Gootee without cause, Gootee's theory that the no-oral-modification clause limited GCS's ability to terminate him would create a contradiction between the terms of the contract.[2] Moreover, under his interpretation of the letter agreement, Gootee, so long as he did not give GCS cause to discharge him, could require the company to continue to employ him as its president indefinitely. Case law enjoins us to avoid an interpretation of a contract that would yield such a commercially unreasonable result, placing one party at the mercy of the other (*see ERC 16W Ltd. Partnership v Xanadu Mezz Holdings LLC*, 95 AD3d 498, 503 [1st Dept 2012]).[3]

Given that the letter agreement was terminable at will, the

---

**1.** The provision states in full: "No modification, amendment, extension, discharge, termination or waiver of any provision of this letter agreement shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought and then such waiver shall be effective only in the specific instance, and for the purpose, for which given."

**2.** The letter agreement recognizes that GCS would be entitled to terminate Gootee without cause in section 15, which provides, in pertinent part, that Gootee will not be bound by certain post-employment noncompetition obligations during periods in which his base salary is not paid "if [his] employment is terminated by the Company without Cause."

**3.** In his moving affidavit, Gootee confirms that he takes the position that the letter agreement entitled him to continue as president of GCS for as long as he wished and remained capable of performing. Gootee states: "I would

next question that arises is, when was it terminated? In my view, the record establishes, as a matter of law, that GCS exercised its right to terminate the letter agreement no later than February 2010, when (as Gootee admits) it completely changed his title and duties and commensurately changed his compensation. Under the letter agreement, GCS had originally hired Gootee as its president, making him "responsible for the overall management and supervision of the Company." As acknowledged by the majority, however, by February 2010, GCS had completely changed Gootee's role by (as the majority states) "remov[ing] [him] as president."

In an email it sent to Gootee in August 2010, GCS stated succinctly: "As you are aware, the company ended your employment relationship as president of the company in February 2010." Gootee himself admits in his affidavit that GCS "removed [him] as president" and assigned him an entirely different, and lesser, set of responsibilities in early 2010. Similarly, Gootee testified at his deposition that "[m]y title and responsibilities changed" in February 2010. In a July 2010 letter to GCS, Gootee acknowledged that "[o]ur discussions . . . resulted in a change in my title from President to Director of Industry Affairs. In that role, [GCS] felt that I would best serve the company by representing it at various conventions, seminars, and trade association conferences, both as a speaker and attendee, a role that I have actively pursued."[4] As Director of Industry Affairs, Gootee also "continued [his] efforts to acquire new business for the company" (as stated in his July 2010 letter), but there is no dispute that the position he filled from February 2010 onward was one entirely different from the presidential office for which he had been originally hired under the letter agreement.[5]

In essence, GCS exercised its right to terminate the at-will

---

not have signed the [letter agreement] without such assurances [that GCS would fulfill its obligations], including the assurance that I would not be terminated without just cause, *and could thereby count on being the president of GCS until I chose to retire*. Since I was 62 at the time [the letter agreement was executed], the GCS position would be my last job until [Gootee's planned] retirement at 67" (emphasis added). Gootee has not offered any theory under which the letter agreement could be construed to require GCS to continue to employ him as president for some reasonable period of time, ascertainable by reference to objective circumstances, rather than for a period of time dictated by Gootee's subjective, unilateral desires.

4. Underscoring his newly subordinate role, Gootee acknowledged at his deposition that he required the new president's approval to attend a conference. GCS also removed him from its board of managers.

5. While the letter agreement provides that GCS had the right, in its discretion, to assign Gootee "other duties and responsibilities" than those of

letter agreement, unilaterally and without cause, in February 2010. Again, since the no-oral-modification clause of the letter agreement does not apply to a termination of the agreement as a whole, it is of no moment that GCS did not deliver a written notice of termination to Gootee at that time.[6] Thereafter, Gootee continued to work for GCS in a lesser role for several months more, although the parties never signed a new contract. During that period, GCS paid Gootee substantially reduced compensation that it believed to be warranted by his substantially reduced responsibilities, but it is undisputed that Gootee accepted the reduced compensation, to which he raised no written protest until the following July. Whether or not Gootee raised an earlier oral protest to the reduction of his compensation, the record establishes that GCS had made it plain to Gootee in February 2010 that it no longer intended to operate under the letter agreement.[7] Accordingly, in my view, the question of whether Gootee waived the no-oral-modification clause, which the majority believes to warrant a trial, simply does not arise.

Seeking some support in the record for the position that the letter agreement continued in effect after February 2010, the majority fastens on Gootee's deposition testimony to the effect that his removal from the presidency was consistent with GCS's right under the letter agreement, as he understood it, to

---

the president, this is not what the company did in February 2010. As noted, at that time, GCS relieved Gootee of substantially all of his responsibilities under the letter agreement and assigned him an entirely different, and lesser, set of responsibilities. I would agree that, if Gootee's role had remained essentially the same, the letter agreement could not be deemed to have been terminated, and changes in his compensation package would have had to be made in a manner consistent with the no-oral-modification clause.

6. Of course, if the no-oral-modification clause did apply to a termination of the letter agreement, a written notice of termination would have been effective against Gootee only if he had signed it. This underscores Gootee's unreasonable position that the letter agreement afforded him the right to open-ended employment as president of GCS, terminable by the company only for cause.

7. Gootee makes only vague claims to have protested GCS's changes to his employment status before his letter of July 21, 2010. In his affidavit, he asserts that he "brought up the subject of [the letter agreement]" when he was demoted, but does not provide details. In his letter of July 21, 2010, Gootee stated that, when GCS advised him of the changes, "I told you that I would not waive any provisions of my employment agreement, but that I also wanted to avoid a confrontation if at all possible."

change his title and responsibilities.[8] Read in context, it is plain that Gootee based this testimony on a misreading of the letter agreement.[9] In any event, Gootee subsequently abandoned this position in his affidavit and in his brief on this appeal, in both of which he expressly condemns his removal from the office of president as a breach of the letter agreement.[10] Indeed, as Gootee notes in his appellate brief, the letter agreement defines "a material diminution in title or responsibility" as an event giving Gootee "Good Reason" to terminate the letter agreement without thereafter being bound by its post-employment noncompetition provisions during periods in which he is not paid his base salary.

In sum, GCS did not simply cut Gootee's pay in February 2010, it also completely changed his status and role within the company, demoting him from president, a full-time leadership position in which he had been "responsible for the overall management and supervision of the Company" (as provided by the letter agreement), to a consultant who represented the company at trade conferences on a part-time basis.[11] GCS thereby effectively terminated the letter agreement—something

---

**8.** Gootee's specific testimony on this point was that GCS "had the right to change[ ] my responsibilities, but they did not have a right to reduce my salary or eliminate my housing allowance."

**9.** The letter agreement requires Gootee to carry out the duties of the president of GCS "as well as such other duties and responsibilities as may from time to time be assigned by the Managers of the Company." This provision permits the assignment of duties in addition to those of the president but does not contemplate a demotion from president to a position of lesser status and responsibility.

**10.** In his affidavit, Gootee states that "GCS breached its Employment Contract with me *when it stripped me of my title as president of GCS* and drastically reduced my compensation" (emphasis added). A few paragraphs later, he states that "GCS cut my pay and *removed me as president of the company, all in violation of my Employment Contract*" (emphasis added). Gootee's appellate brief makes a number of statements to the same effect: (1) "GCS breached the Written Employment Contract by removing Mr. Gootee as the President of GCS and substantially reducing his salary" (aff of plaintiff at 2); (2) "the actions taken by GCS in removing Mr. Gootee as company president, reducing his responsibilities, slashing his compensation; and failing to issue 375,000 shares of GCS stock were material breaches of the Written Employment Contract" (*id.* at 8-9); (3) "GCS's removal of Mr. Gootee as president, [and] the substantial reduction in his compensation . . . were breaches of the Written Employment Contract" (*id.* at 9).

**11.** This is confirmed in an email that GCS sent to Gootee on or about August 30, 2010, which states: "As you are aware, the company ended your employment relationship as president of the company in February 2010." That Gootee made unsupported assertions to the contrary in his communications to GCS, or at his deposition in this matter, does not change the fact that, as of February 2010, the parties ceased to operate under the letter

that, as the majority recognizes, it had the right to do at will, without obtaining Gootee's written consent. While Gootee was free to respond to GCS's action by leaving the company's employ without being bound by the letter agreement's non-competition restrictions unless he continued to receive his base salary, he chose instead to continue to work for GCS as a consultant at reduced compensation, without making any written objection for six months.[12]

Gootee's assertion in his letter of July 21, 2010, that, when he was demoted the previous February, he had "told [GCS] that [he] would not waive any provisions of . . . [the letter] agreement, but that [he] also wanted to avoid a confrontation if at all possible," is legally unavailing, even if true. This is because, upon Gootee's demotion, the letter agreement had been terminated, and he had no continuing right to be compensated in accordance with it. Stated otherwise, the rights Gootee claimed in his July 2010 letter that he had "not waive[d]" the previous February no longer existed at that time. Thus, the factual question that the majority believes should be determined at trial—"whether [Gootee] waived the no oral modification clause"—is illusory. Whatever Gootee said to GCS at the time of his demotion, he had no rights under the letter agreement to waive once GCS had terminated the letter agreement. A right that no longer exists cannot be waived.[13]

As previously noted, I agree that the no-oral-modification

agreement with respect to either one's rights or obligations. Gootee no longer served as GCS's full-time president but as a part-time consultant representing the company at trade conferences, and GCS no longer compensated Gootee as president but at a level commensurate with his new, and lesser, responsibilities. The letter agreement was terminated, but the parties entered into a new, and entirely different, employment relationship, albeit one for which no written agreement was executed.

**12.** The majority erroneously views certain language in a draft consulting agreement that GCS sent to Gootee in July 2010 as evidence that the letter agreement remained in force after February 2010. The majority's error is in viewing the statements in that document to which it draws attention as admissions of fact probative of whether the letter agreement had already been terminated. Those statements, to the extent they appear to indicate that the letter agreement remained in force after February 2010, are merely legal conclusions concerning the parties' relationship to each other—not, contrary to the majority, "statements of fact" concerning the conduct of either party—which do not change the facts of record establishing that GCS terminated the letter agreement in February 2010. Certainly, if a pleading contained a statement to the effect that a certain agreement was in effect at a certain time, the opposing party could properly plead in response that such a statement is a legal conclusion to which no answer is required.

**13.** Contrary to the majority's view, neither is there any triable issue as to whether GCS terminated the letter agreement. For the reasons I have already discussed, the record establishes as a matter of law that GCS

clause prevented GCS from unilaterally reducing Gootee's compensation while requiring him to perform substantially the same job. However, this bench is unanimous in finding that the letter agreement was terminable at will by either party. In my view, GCS exercised its right to terminate the letter agreement at will by removing Gootee from the presidency in February 2010. At that point, GCS gave Gootee the option of continuing in its employ in a completely different, part-time position, involving far less responsibility and time commitment, at a commensurately reduced rate of pay. The change in both position and compensation constituted, as a matter of law, a new hiring (*see Hanlon v Macfadden Publs.*, 302 NY 502, 505-506 [1951]; *Waldman v Englishtown Sportswear*, 92 AD2d 833, 836 [1st Dept 1983]). Gootee, by choosing to remain in GCS's employ in the new position, necessarily also accepted the reduced compensation package that went with that position (*see Jennings v Huntington Crescent Club*, 120 AD3d 1394 [2d Dept 2014]; *Minovici v Belkin BV*, 109 AD3d 520, 523 [2d Dept 2013]; *Kronick v L.P. Thebault Co., Inc.*, 70 AD3d 648, 649 [2d Dept 2010]).[14]

The majority states: "By th[e] unambiguous language [of the no-oral-modification clause], [GCS] gave up any right it had to modify [Gootee's] duties, compensation and benefits, without a writing signed by [Gootee]." This begs the question of whether GCS's complete discharge of Gootee from the duties as president for which he had been hired under the letter agreement, and offer to him of an entirely different set of lesser duties, for which he would receive commensurately lesser compensation, constituted a "modification" of the terms of the letter agreement or, alternatively, an exercise of GCS's right— which this bench recognizes unanimously—to terminate that contract at will, coupled with an offer to rehire Gootee for a new position, at lesser compensation, that he was free either to accept or to reject. Again, the facts established by the record— which are essentially undisputed—constitute, in my view, a termination and rehiring as a matter of law.

---

terminated the letter agreement unilaterally, as it was entitled to do, in February 2010.

14. The majority states that "none of the cases cited by the dissent in support of its position appear to discuss the effect of a no oral modification clause on an employer's right to alter the terms of employment." This misconceives the issue presented by this appeal, which is whether a no-oral-modification clause in an employment agreement has any effect on the employer's right to discharge the employee at will from the position for which he was hired by the written agreement and to rehire the same employee for a different position at different compensation. The majority cites no authority addressing that issue.

The implication of the majority's decision is that GCS's rehiring of Gootee as a part-time consultant may or may not have retroactively deprived GCS of its right to terminate at will Gootee's employment in his previous position as president. The facts on which the majority believes that this determination should depend are not at all clear from the majority's decision. The parties' sole factual dispute appears to be whether Gootee made an oral protest upon his demotion and the reduction of his compensation in February 2010. Whether or not Gootee made such a protest, GCS's discharge of him as its president and his acceptance of the new position, and the reduced pay that went with it, should be deemed to constitute a termination and rehiring as a matter of law.

The majority's view that the radical transformation of the parties' relationship in February 2010 may rationally be construed as something other than a termination and rehiring elevates form over substance. Indeed, as previously noted, the majority's creation of the spurious triable issue of whether, in February 2010, the letter agreement was terminated or, alternatively, modified, essentially contradicts the majority's own acknowledgment that Gootee's employment under the letter agreement was terminable at will by either party. Having rightly rejected the absurd position advanced by Gootee as the cornerstone of his lawsuit—that the letter agreement required GCS to retain him as its president indefinitely, absent cause for termination—the majority creates an alternative basis for Gootee's claims, completely inconsistent with the at-will status the majority has just held to have existed as a matter of law, and sends the matter to trial on a record devoid of any material factual dispute. I would hold, consistently with the at-will nature of Gootee's employment under the letter agreement, that the undisputed facts establish that he was terminated as president and rehired as something else, leaving no basis for his claims in this action. No matter how the majority may try, it cannot avoid the fact that its finding of some issue of fact contradicts its own recognition that Gootee was an at-will employee. In this regard, it may be asked: If Gootee's going from president of the company to a part-time consultant does not bespeak a new relationship between the parties, what would?

Finally, even if the letter agreement could be deemed to have continued in effect after February 2010, I believe that Gootee's performance of his new, reduced role for several months thereafter is, as a matter of law, unequivocally referable to his acceptance of GCS's modifications of his rights under the letter

agreement—including the reduction of his compensation package—and therefore would have constituted a waiver of the requirements of the no-oral-modifications clause (*see Rose v Spa Realty Assoc.*, 42 NY2d 338, 343-344 [1977]; *Barber v Deutsche Bank Sec., Inc.*, 103 AD3d 512, 513 [1st Dept 2013]). Whether or not he attempted to reserve orally his perceived rights under the letter agreement, Gootee's acceptance of his demotion and performance of his diminished responsibilities under a lesser title, from February 2010 until the following August (and without any written protest until July of that year), cannot reasonably be squared with the expectation that he would continue to receive the much higher compensation the letter agreement set for him as president of the company.[15]

For the foregoing reasons, I would reverse the order appealed from, deny Gootee's motion for summary judgment as to liability, and grant GCS summary judgment dismissing Gootee's complaint and on its counterclaim. I respectfully dissent to the extent the majority does otherwise.

---

**15.** This Court's decision in *Tierney v Capricorn Invs.* (189 AD2d 629 [1st Dept 1993], *lv denied* 81 NY2d 710 [1993]), which the majority cites in support of its finding of a triable issue concerning waiver, is not to the contrary. *Tierney* rejected a claim by an employee that, notwithstanding his written employment agreement's no-oral-modification clause, he was entitled to a bonus, pursuant to an alleged oral agreement, for work on a particular transaction. In so doing, we noted that the employee's work on the transaction, which was within the scope of his duties under the written employment agreement, was "equally consistent with his desire to continue to earn his compensation under the written Employment Agreement, as with the alleged oral modification" (189 AD2d at 631). In this case, by contrast, GCS replaced Gootee's duties as president under the letter agreement with an entirely different, and lesser, set of duties. Any expectation by Gootee that he would continue to be compensated at the presidential rate set by the letter agreement for the lesser services he performed from February 2010 onward would have been entirely unreasonable.